lml

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | Case No. 07-40019-01-JAR |
| ) | |
| ) | |
| JOSE H. VELAZQUEZ, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## MEMORANDUM ORDER AND OPINION
## DENYING DEFENDANT'S SECOND MOTION TO SUPPRESS

This matter comes before the Court on defendant Jose Velazquez's second Motion to Suppress Evidence and Statements (Doc. 45). Defendant moves to suppress all items seized from the vehicle that he was driving on February 27, 2007, as well as any statements made subsequent to his arrest. A hearing on defendant's motion was held on March 24, 2008, at which time the Court took the motion to suppress under advisement. After reviewing the parties' filings and the evidence adduced at the hearing, the Court is now prepared to rule. For the reasons stated below, the Court denies defendant's motion to suppress.

**I.   Factual Background**

On February 27, 2007, Kansas Highway Patrol Troopers Jerett Ranieri and Andrew Dean stopped a Chrysler Sebring convertible on Interstate 70 in Geary County, Kansas. Trooper Ranieri stopped the vehicle after he initially noticed that the vehicle's front license plate was askew and seemed to be attached by only one bolt and also because he saw the driver make an unsafe lane change. Trooper Ranieri approached the passenger's side of the vehicle and spoke

with the driver, who identified himself as defendant, Jose Hernandez Velazquez. Defendant produced a California driver's license, and the trooper explained his reasons for the stop.

During the subsequent conversation with defendant, Trooper Ranieri asked defendant several questions, summarized as follows: where he was going; whether he was on vacation; had he grown up in St. Louis; had he been there before; how many times had he been to St. Louis; how long he would be there; the manufacture year of defendant's vehicle was; how long he had owned the vehicle; whether the vehicle ran well; and whether he was going to St. Louis Illinois or Missouri. Defendant responded that he was traveling from California to St. Louis, Missouri. The trooper then walked around the vehicle, spoke with defendant about the license plate, and returned to his cruiser to check defendant's license and registration.[1]

Trooper Ranieri testified that during this initial encounter, he noticed several indicators that he associated with drug trafficking: (1) defendant appeared to be nervous; (2) there was a strong odor of air freshener in the vehicle; (3) he recognized a Boost walkie-talkie cell phone in the vehicle; and (4) he thought defendant's route of travel was implausible because I-70 was not the most direct route defendant could have taken to St. Louis. After returning to his cruiser, Trooper Ranieri ran checks with dispatch and was advised that defendant had an extensive criminal history for prior drug trafficking.

Trooper Ranieri returned to the passenger side of defendant's vehicle within approximately ten minutes. The trooper told defendant he had issued him a warning rather than a ticket, and told defendant, "take care." He then told defendant, "you guys take care. Thanks for your time,"

---

[1] Trooper Ranieri also testified that defendant produced two registrations for the vehicle and that one did not match the license tag on the car. The trooper asked defendant if he had lost his license plates, but does not recall the answer, which was inaudible on the video tape.

took a couple of steps away from the vehicle towards his cruiser, then turned around and went back to where he had been standing. He then asked defendant, "there's uh, nothing—no illegal drugs or anything in your trunk?" When defendant replied no, the trooper asked, "do you mind if I take a look and check?" Defendant agreed and popped open the trunk. Trooper Dean then exited the cruiser and assisted Trooper Ranieri with the search.

Trooper Ranieri testified that while searching the trunk, he discovered after-market alterations, which, in his training and experience, indicated drug trafficking. The trooper testified he observed: (1) fresh tool marks on the carpet snap screws; (2) glued down carpet; (3) different color paint; (4) non-factory sheet metal; (5) non-factory weld marks; (6) fresh finger marks in the rear wheel wells; (7) fresh tool marks on the rear wheel well cover screws; and (8) fresh tool marks on the rear wheel's lug nuts. Trooper Ranieri testified that there was a piece of carpet between the trunk area and the back seat of the vehicle, where the convertible top goes down, and that he could access the back seat from the trunk. Satisfied that the vehicle had a false compartment, the troopers then searched the inside of the car. Trooper Ranieri testified that defendant did not object to where the troopers searched or limit the scope of his consent to search.

One of the troopers then drove the vehicle and defendant from the highway to the Junction City impound area. A more thorough search was conducted there, and the troopers found a false compartment built into the trunk area behind the rear seat. Inside this compartment, they discovered 19 kilogram-sized bricks of cocaine. Defendant later admitted in an interview with another trooper that he knew he was transporting illegal drugs for delivery to an unknown third party in the St. Louis area.

**II.  Discussion**

    **A.**        **Initial Stop**

The Court previously found that Trooper Ranieri's initial stop of defendant's vehicle was lawful, based on his observations that the vehicle's tag was partially unfastened and unreadable, and because defendant made an unsafe lane change.[2]

    **B.**        **Detention**

Defendant contends that he was subject to an unreasonable detention because Trooper Ranieri took his license and asked him questions for several minutes before calling his information into dispatch or otherwise furthering the purpose of the stop.  Some of these questions related to travel and some did not.  An officer conducting a traffic stop may request a driver's license, vehicle registration, run a computer check, and issue a citation.[3]  An officer may also "ask questions about the motorist's travel plans and authority to operate the vehicle" in addition to obtaining the relevant documentation.[4]  Beyond these specific questions, the Tenth Circuit has held that, in light of *Muehler v. Mena*,[5] as long as the trooper's questioning does not extend the length of the detention, there is no Fourth Amendment issue with respect to the content of the questions.[6]  Once the purpose of the stop is satisfied, however, the driver's detention must end without undue delay.[7]

---

[2](Doc. 23 at 4-7.)

[3]*See United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001).

[4]*United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1258 (10th Cir. 2006).

[5]544 U.S. 93 (2005).

[6]*Alcaraz-Arellano*, 441 F.3d at 1258; *United States v. Wallace*, 429 F.3d 969, 974 (10th Cir. 2005).

[7]*United States v. Edgerton*, 438 F.3d 1043, 1047 (10th Cir. 2006).

The Court has reviewed the timing involved in defendant's traffic stop and finds that the length of the detention was reasonable and that Trooper Ranieri's actions were reasonably related to the stop. All of the trooper's questions, the majority of which related to travel plans and car ownership, were asked in less than one minute. The total time for the stop from the initial contact to defendant's receipt of his documents and the warning was approximately twelve minutes, which is not unreasonable under the facts of this case. Thus, the Court concludes that the trooper acted diligently and did not unnecessarily prolong the detention.

### C.     Consensual Encounter

Defendant next contends that he was illegally detained after Trooper Ranieri returned his license and paperwork, told him to "take care," and stepped away from the vehicle. Defendant argues that these actions did not transform the detention into a consensual encounter because the trooper used a commanding tone of voice, another trooper was present, and the trooper did not tell defendant that he was free to go.

After the purpose of a traffic stop is complete, "further detention for purposes of questioning unrelated to the initial stop" is generally impermissible.[8] In general, prolonging the detention for further questioning beyond that related to the initial stop is permissible in two circumstances: (1) if the officer has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring; or (2) if the initial detention has become a consensual encounter.[9]

"A traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the

---

[8]*United States v. Bradford*, 423 F.3d 1149, 1156-57 (10th Cir. 2005).

[9]*United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998).

driver by an overbearing show of authority."[10]  The Tenth Circuit follows a "bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned."[11]  The court has explained,

> The return of a driver's documentation is not, however, always sufficient to demonstrate that an encounter has become consensual.  A routine traffic stop becomes a consensual encounter once the trooper has returned the driver's documentation so long as a reasonable person under the circumstances would believe [they] were free to leave or disregard the officers request for information.[12]

Considering the totality of the circumstances, the Court finds that defendant's detention was transformed into a consensual encounter when Trooper Ranieri returned defendant's paperwork and told him to "take care," and stepped away from the vehicle.  An encounter does not become non-consensual merely because an officer fails to advise a driver that he was free to go.[13]  It was only after the trooper told defendant to take care and stepped away from the vehicle towards the patrol vehicle that defendant was asked if he had any illegal drugs in the vehicle, followed by a request to search the vehicle.  After reviewing the video of the stop, the Court finds there is no indication that Trooper Ranieri made any "coercive show of authority" such that a reasonable person would not have felt free to leave.[14]  The trooper did not use any force throughout the encounter, did not brandish or touch his weapon, did not make any threats or commands, and did

---

[10]*United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000).

[11]*Bradford*, 423 F.3d at 1158.

[12]*Id*. (internal quotations and citations omitted).

[13]*See, e.g., United States v. Chavira*, 467 F.3d 1286, 1291 (10th Cir. 2006) (citing *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996)); *Bradford*, 423 F.3d at 1158.

[14]*United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991) (discussing factors for finding a "coercive show of authority).

not physically touch defendant. While defendant correctly points out that Trooper Dean was also present, he stayed in his patrol vehicle until Trooper Ranieri obtained consent to search; thus, Trooper Dean's presence alone does not qualitatively add to the coerciveness of this encounter.[15] Accordingly, because the encounter was consensual, defendant's subsequent consent to search was not the product of an unlawful detention.[16]

### D.      Consent to Search

Defendant argues that his consent to search was both involuntary and tainted by his illegal detention. He argues that his post-arrest statement given to DEA agents was similarly tainted. As discussed above, defendant was not illegally detained at any time during the encounter. Thus, the Court's inquiry is limited to whether defendant's consent was voluntary. Defendant argues that his consent was "clearly coerced" because Trooper Ranieri did not give him "sufficient indication that his detention was finished" or tell him he was free to leave, another trooper was on the scene and Ranieri used commanding language.

"Valid consent is consent which is freely and voluntarily given."[17] Voluntariness of consent is a question of fact to be determined from all the circumstances; a court should neither presume that the consent was voluntary nor involuntary.[18] The government bears the burden of proving

---

[15]*Chavira*, 467 F.3d at 1291.

[16]Because the Court finds that the initial detention had become a consensual encounter, it need not also find that Trooper Ranieri had a reasonable and articulable suspicion of illegal activity. The Court makes the additional finding, however, that reasonable suspicion did exist: defendant was very nervous throughout the stop; the trooper detected the odor of deodorizer from the vehicle and saw an air freshener; the trooper recognized a walkie-talkie cell phone in the vehicle, often used by drug couriers; defendant's travel route was indirect; and dispatch relayed that defendant had a prior history of drug trafficking. These factors collectively amounted to reasonable suspicion of illegal activity. *See United States v. Arvizu*, 534 U.S. 266, 273, 277 (2002).

[17]*United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999).

[18]*United States v. Hernandez*, 93 F.3d 1493, 1500 (10th Cir. 1996).

that consent was voluntary under the totality of the circumstances.[19] To satisfy this burden, the government must show that the consent was unequivocal and specific and freely and voluntarily given.[20] Mere submission to lawful authority does not equate to valid consent.[21] Language barriers are relevant in evaluating a defendant's ability to act knowingly, intelligently, and voluntarily.[22]

For the reasons previously discussed in finding the encounter was consensual, the Court also finds defendant's consent was voluntary. The Tenth Circuit has "reject[ed] the suggestion that the trooper's failure to advise [defendant] that he was free to leave, or that he could refuse consent to search, render[s] the consent involuntary."[23] There is no indication that Trooper Ranieri used coercive tactics to obtain the consent. And, when Ranieri asked for and received consent, Trooper Dean was still in the patrol vehicle. The Court determines that Trooper Ranieri lawfully obtained consent to search the vehicle under the totality of the circumstances.[24]

**E.     Scope of Search**

Finally, defendant contends that the scope of the troopers' search exceeded the scope of his consent. Defendant argues that he gave the troopers consent to search the trunk, but they exceeded the scope of this consent when they searched the interior of the vehicle. Trooper

---

[19]*United States v. Gregoire*, 425 F.3d 872, 879 (10th Cir. 2005); *Patten*, 183 F.3d at 1194.

[20]*United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998).

[21]*United States v. Manuel*, 992 F.2d 272, 275 (10th Cir. 1993).

[22]*United States v. Hernandez*, 893 F. Supp. 952, 961 (D. Kan. 1995), *aff'd*, 103 F.3d 145 (10th Cir. 1996).

[23]*United States v. Gregoire*, 425 F.3d 872, 880 (10th Cir. 2005).

[24]Even if the Court found that defendant's consent was not knowing and voluntary, Trooper Ranieri had developed reasonable and articulable suspicion that illegal activities were taking place during the course of the traffic stop sufficient to justify the continued detention and search. *See supra* note 15.

Ranieri testified that after he and Trooper Dean found after-market alterations during their search of the trunk, they entered the passenger compartment of the vehicle to look for further alterations. The scope of the consent determines the permissible scope of the search.[25] A "court determines from the totality of the circumstances whether a search remains within the boundaries of the consent, viewing the evidence in the light most favorable to the government."[26] "The general rule is that where a suspect does not limit the scope of a search, and does not object when the search exceeds what he later claims was a more limited consent, an officer is justified in searching the entire vehicle."[27] In this case, the troopers expanded their search of the trunk into the interior of the vehicle after they saw alterations in the trunk. Defendant did not object when the troopers entered the interior, and his failure to object allowed the officers to search the interior. In addition, Trooper Ranieri testified that the trunk and the interior of the vehicle were separated by a piece of carpet where the convertible top goes down, and that the trunk was accessible from the interior, as this vehicle was a convertible. Thus, the totality of the circumstances supports a finding that the search was within the scope of consent.

Alternatively, even if the troopers unlawfully exceeded the scope of defendant's consent, the search was justified based on probable cause. During the course of their consensual search of the trunk, the troopers found evidence of after-market alterations, which indicated to them that the vehicle had a hidden compartment. Probable cause to search a vehicle is established if under the totality of the circumstances there is a fair probability that the car contains contraband or

---

[25] *United States v. Marquez*, 337 F.3d 1203, 1207 (10th Cir. 2003).

[26] *United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000).

[27] *Id.*; *United States v. Jackson*, 381 F.3d 984, 988 (10th Cir. 2004).

evidence;[28] and an officer may draw inferences based on his own experiences.[29]

"It is well established that evidence of a hidden compartment can contribute to probable cause to search."[30] The Tenth Circuit uses a two-factor test to determine whether evidence of a hidden compartment, by itself, is sufficient to establish probable cause: (1) the likelihood that there really is a hidden compartment; and (2) the likelihood that a vehicle with a hidden compartment would, under the circumstances, be secreting contraband.[31] In this case, the first factor was met when the troopers observed the alterations in the trunk, which Trooper Ranieri testified was strongly suggestive of a hidden compartment. Trooper Ranieri testified he observed: (1) fresh tool marks on the carpet snap screws; (2) glued down carpet; (3) different color paint; (4) non-factory sheet metal; (5) non-factory weld marks; (6) fresh finger marks in the rear wheel wells; (7) fresh tool marks on the rear wheel well cover screws; and (8) fresh tool marks on the rear wheel's lug nuts. Trooper Ranieri also testified that through his training, he learned that this type of convertible, a Sebring, was a common source of a hidden compartment, as the manner in which the top went down left a void between the interior and the trunk.

The second factor was also met, as supported by Ranieri's testimony that such compartments are commonly used to transport illegal drugs and there are few, if any, legitimate uses for adding such a compartment to a vehicle. Thus, the troopers had probable cause to search defendant's vehicle once they observed the alterations and associated them with false

---

[28]*United States v. Nielsen*, 9 F.3d 1487, 1489-90 (10th Cir. 1993).

[29]*United States v. Mercado,* 307 F.3d 1226, 1230 (10th Cir. 2002).

[30]*United States v. Jurado-Vallejo*, 380 F.3d 1235, 1238 (10th Cir. 2004) (citing cases).

[31]*Id.*

compartments.

Accordingly, the troopers were justified in searching the vehicle based on probable cause, irrespective of defendant's consent or any limitations as to scope.[32]

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion to Suppress Evidence and Statements (Doc. 45) is DENIED.

IT IS SO ORDERED.

Dated this 28th day of April 2008.

                                            S/ Julie A. Robinson
                                            Julie A. Robinson
                                            United States District Judge

---

[32]*See United States v. Luna-Santana*, 128 F. App'x 42, 48 (10th Cir. 2005) (finding defendant's consent to search vehicle rendered "irrelevant" when officers located items in vehicle that gave them probable cause to search).